Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 141 | **DATE** | 1/14/2002 |
| **CASE TITLE** | United States of America vs. Jose Ruben Herrera-Corral, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)¹ ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Before the court is the defendants' motion to suppress evidence [34-1]. The court finds that the defendants have standing to challenge this search and that the agents' entry into the South Winchester apartment violated their Fourth Amendment rights. However, the parties have not adequately addressed what now emerges as an important issue: whether consent obtained following an illegal entry and observation of the disputed evidence can legitimate the admission of the disputed evidence. The parties may file cross briefs on this issue within ten days of the date of this order and cross replies seven days thereafter.

(11) ■ [For further detail see order attached to the original minute order.]

No notices required, advised in open court.
No notices required.
Notices mailed by judge's staff.
Notified counsel by telephone.
Docketing to mail notices.
Mail AO 450 form.
Copy to judge/magistrate judge.
courtroom deputy's initials

number of notices
JAN 17 2002
date docketed
docketing deputy initials
date mailed notice

FILED-ED2
02 JAN 16 PM 1:

Date/time received in central Clerk's Office

**Document Number**
64

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JAN 1 7 2002

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )          No. 01 CR 141
         v.                        )
                                   )
JOSE RUBEN HERRERA-CORRAL, and     )
FIDEL ROBELES-ORTEGA, a/k/a        )          Judge Joan B. Gottschall
FIDEL ROBLES-ORTEGA,               )
                                   )
                    Defendants.    )

## MEMORANDUM OPINION AND ORDER

On May 17, 2001, defendants, Jose Ruben Herrera-Corral ("Ruben"), and Fidel Robles-Ortega ("Fidel"), were indicted for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. Defendants have filed a Motion to Suppress evidence seized on the day of their arrest.

### Facts

In January, 2001, a confidential informant ("CI") working for the Drug Enforcement Agency ("DEA") allegedly negotiated a deal to buy seven kilograms of cocaine from defendant Ruben. The CI recorded telephone conversations with Ruben in which the two negotiated the sale. On February 1, 2001, the CI was to meet Ruben at an apartment at 3506-8 South Winchester in Chicago ("Chicago apartment"); however, Ruben did not arrive. On February 2, 2001, the CI reported that he met with Ruben and that during the meeting Ruben telephoned defendant Fidel, who was Ruben's father-in-law and "cocaine supplier." (Government's Consolidated Resp. to Defs.' Pretrial Mots. at 9 ("Government's Resp.").) The CI then spoke on



the telephone with Fidel, who agreed to supply the CI with cocaine; Fidel told the CI that he would be at the Chicago apartment within the hour. Ruben told the CI that Fidel would be arriving from Wisconsin. Fidel did not arrive within an hour, and the deal did not take place.

On February 14, 2001, in the early afternoon, the CI had a recorded telephone conversation with Ruben in which Ruben notified the CI in code that his supplier had brought the cocaine to the Chicago apartment. Neither defendant Fidel nor defendant Ruben was a leaseholder of the Chicago apartment. The government's plan was to have the CI enter the Chicago apartment on February 14, 2001, wearing a wire. There was no plan for the CI to use a transmitting device or code word to signal the agents to enter the apartment. Rather, the government's plan was to have the CI view the cocaine, then leave the apartment and convince defendants to follow him outside, where federal agents would make the arrest.

At about 2:00 p.m. February 14, 2001, the CI entered the Chicago apartment, wearing a wire. DEA agents watched the building from outside, recorded the conversations, and monitored the conversations live from a transmitter. Once inside, the CI was allegedly shown a bag full of cocaine. The CI then negotiated with both defendants about amounts and prices. When the price was eventually raised, the CI agreed, then started to exit, stating that he would "bring everything together." (Defs.' Ex. Transcript at 4:29-30.) The CI did not suggest to the defendants that he had the money with him and did not indicate when he would return. The CI left the apartment and got into a car parked across the street, with a DEA agent in the driver's seat. (The CI had told defendants that his nephew had driven him.) The CI told the agent, while other agents were listening over the wire, that he had seen the cocaine. The agent and CI then drove away. Within two minutes of the CI's exit from the apartment, agents forcibly entered the apartment, without a

2

warrant, by breaking the door.[1] The agents then searched the apartment. At some point, an agent discovered a gym bag filled with cocaine. The government claims that the bag was hidden only partially under a bed and was open enough so that the agent could see, without moving the bag, items wrapped in plastic and brown tape, which the agent concluded were packages of cocaine. Agents also convinced a leaseholder of the apartment, Azuzena Tabizon ("Tabizon"), to sign a form through which she consented to the search of her apartment. There is a dispute as to when Tabizon signed the consent form in relation to when the agents discovered the gym bag.

## Analysis

Defendants argue that the DEA agents forcibly entered the Chicago apartment without a search warrant, violating their Fourth Amendment rights. They seek to suppress all evidence seized from that apartment. The government makes two broad arguments in opposition to defendants' motion. First, the government claims that Ruben and Fidel did not have a legitimate expectation of privacy at the Chicago apartment and therefore cannot challenge the DEA's seizure of evidence. Second, the government argues that even if defendants did have a legitimate expectation of privacy, their Fourth Amendment rights were not violated by the DEA's entry and search of the apartment.

## I. Expectation of Privacy

The government claims initially that Ruben and Fidel did not have a legitimate expectation of privacy at the Chicago apartment on February 14, 2001 such that they may challenge the DEA's seizure of evidence from that apartment. Specifically, the government

---

[1]There is a question as to whether the agents knocked and announced their presence before entering.

3

claims that defendants were not residents at the apartment, but rather used the premises to conduct their business of narcotics trafficking. Defendants argue that they were overnight guests at the apartment.

A defendant may move for suppression of evidence only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Padilla*, 508 U.S. 77, 81 (1993). Therefore, the defendant must show that he had a legitimate expectation of privacy in the premises searched or the items seized. *United States v. Torres*, 32 F.3d 225, 230 (7th Cir. 1994), *cert. denied*, 513 U.S. 1116 (1995); *United States v. Salvucci*, 448 U.S. 83, 91-92 (1980). Defendants can have "a legally sufficient interest in a place other than [their] own home so that the Fourth Amendment protects [them] from an unreasonable government intrusion into that place." *Terry v. Martin*, 120 F.3d 661, 663 (7th Cir. 1997). "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). Thus the relevant question is whether Ruben and Fidel were overnight guests at the Chicago apartment or were merely present with the consent of the householder.

A. Ruben

The leaseholders of the Chicago apartment are Azuzena Tabizon and Carmen Herrera. To show that Ruben was an overnight guest, defendants point to testimony from Tabizon and Ruben's wife Maribel Herrera ("Maribel"). Tabizon and Maribel testified that in January or February 2001, Ruben and his wife Maribel moved from Wisconsin into the Chicago apartment because they needed a place to stay while they looked for an apartment of their own in Chicago. They kept their clothing and toiletries at the apartment. Tabizon testified that she did not mind

that they lived there. Maribel testified that she and Ruben were given keys to the apartment. In an affidavit submitted to the court, Maribel states that after living in the Chicago apartment for several weeks, she and Ruben left Chicago to go to Wisconsin so that he could undergo refractive eye surgery on February 8, 2001. She adds that Ruben left Wisconsin on February 12 to return to the Chicago apartment (although later testimony revealed that Ruben had a follow-up appointment with his eye doctor in Wisconsin at 8:30 a.m. February 14). Tabizon testified that Ruben and Maribel had left their clothes in the Chicago apartment while they were gone. It appears that this evidence is sufficient to establish a legitimate expectation of privacy in the apartment. Ruben had a key to the Chicago apartment, kept his belongings inside the apartment, and intended to remain in the apartment the night of February 14. *Cf. Terry*, 120 F.3d at 664 (affirming the lower courts' decision that the defendant had no legitimate expectation of privacy at an apartment where "he had no key to the apartment, no belongings inside the apartment, and no intent to remain at the apartment longer than necessary to complete his drug transaction").

The government challenges the credibility of both Tabizon and Maribel. The government argues that Tabizon is incredible as a witness for multiple reasons. First, the government contends that Tabizon indicated that she did not know English very well, but it was clear when she testified that she had a firm grasp of the language. The court disagrees. Tabizon indicated that she preferred Spanish to English while testifying--nothing more. Her comfort with Spanish while she testified bore this out. Second, the government argues that Tabizon testified that she was unemployed for the six months prior to February 14, but on her application to rent the Chicago apartment, she indicated that she was employed through a temporary employment agency and had worked much of that time. This casts little doubt on her credibility. Since

Tabizon did not have a full-time job but was only employed through a temporary agency, it makes some sense that she testified that she was unemployed at the time. Moreover, the fact that someone testifies that they were unemployed for six months when in fact they had worked infrequently for a temporary agency does not seem to the court a falsehood of such significance as to justify disbelieving that person's entire sworn in-court testimony. (Nor does embellishing one's employment status on a lease application if that is in fact what occurred.)

The government claims that Maribel should not be believed because of her obvious motive to help her husband and father. In addition, the government makes an argument about the manner in which Maribel ended her job with her Wisconsin employer, which shows her dishonesty. Essentially, if Maribel truly lived in Chicago, the government argues, she never indicated this to her employer. Instead, she submitted an address form to her employer on January 7, 2001 that indicated her home was in Wisconsin. In addition, when she informed her employer that she wanted to take some time off, she said that it was because she had to care for her child–not that she was looking for an apartment in Chicago. The court takes this argument into consideration, but concludes that it does not, by itself, necessitate a rejection of Maribel's entire testimony. Maribel adequately explained why she gave her employer the information she did.

Although the government raises a question as to the witnesses' credibility, without more actual evidence it fails to overcome defendants' showing that Ruben was indeed an overnight guest. Some courts have rejected the credibility of witness testimony that defendants were overnight guests without corroborating evidence. *See United States v. Gale*, 136 F.3d 192 (D.C. Cir. 1998) (defendant's own testimony that leaseholder gave him permission to stay in an

6

apartment was incredible because there was no substantial amount of clothing and no furniture in the apartment); *United States v. Hiles*, 908 F.2d 974 (6th Cir. 1990) (defendant's claim that he intended to stay the night at an apartment was incredible after he reserved a room at a nearby hotel); *United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988) (defendant's claim that he planned to spend the night at a third-party's apartment was not credible because all of his luggage was at his co-defendant's apartment); *United States v. Leonard*, 1991 WL 176211 (D. D.C. Aug. 30, 1991) (sole testimony of defendant's girlfriend that defendant was an overnight guest was not credible because there was no corroborating documents or testimony and defendant was found with his clothes on in a lit room in the early morning). However, in this case defendants have offered more than just their own claim that they intended to stay the night at the Chicago apartment. There is additional testimony from the leaseholder, as well as other people who visited the apartment, corroborating defendants' claim.

The government has offered some affirmative evidence. First, the government argues that Ruben had an infant son, who defendants claim stayed with Ruben and his wife at the Chicago apartment. However, one of the officers who entered the apartment on February 14 testified that he saw no evidence of a baby, such as diapers or baby blankets. In fact, Tabizon never testified that there was *ever* a baby in the apartment. The government seems to rely on this evidence to show either that Ruben and Maribel never lived at the Chicago apartment or that once they left Chicago for Wisconsin, they had no intention to return. However, as the defendants point out, the officer who testified was obviously not looking for any evidence of a baby; he was looking for evidence of narcotics. In addition, Maribel testified that on February 14, she was in Wisconsin, presumably with the baby, because she was planning to attend a wedding there on

February 17. It is possible, and not inconsistent with the facts as offered by the defense, that there would have been no evidence of a baby in the apartment on the day of the search.

Second, the government argues that even if Ruben was at one time an overnight guest at the apartment, that status ended when he returned to Wisconsin for eye surgery because he took all of his belongings with him. In support, the government points to the transcript of the recording of the CI's wire transmissions. Apparently at one point Ruben told the CI, from a telephone in Wisconsin, that he would not return to Chicago if there was no drug deal, indicating that he no longer lived there and may have taken his belongings with him. However, defendants' witnesses testified otherwise: that Ruben and Maribel left their clothes at the Chicago apartment during their trip to Wisconsin and that Ruben intended to return and stay at the Chicago apartment after the eye operation.

Without more evidence from the government, the defendants' account is sufficiently credible to carry their burden on this issue. Therefore, defendants have successfully shown that Ruben was an overnight guest on February 14, 2001 and may challenge the DEA's seizure of evidence from the premises.

B. Fidel

Defendant Fidel creates a different question. Defendants point to the affidavit and testimony of Guadalupe Robles ("Guadalupe"), Fidel's daughter, to show that he was an overnight guest. In addition, defendants use Tabizon's testimony to support their argument.

Guadalupe testified that she and Fidel both reside in Wisconsin. However, on February 14, 2001 they traveled to Chicago so that Guadalupe could buy a dress for the upcoming wedding in Wisconsin on February 17. The reason that she traveled to Chicago for the dress was because

there are specialty shops in the Pilsen neighborhood that she thought would have the size and style that she wanted. According to her affidavit, Guadalupe and Fidel intended to stay at the Chicago apartment for two days. Tabizon testified that she did not object to allowing Guadalupe and Fidel to stay at the apartment February 14. She also testified that Guadalupe and Fidel had luggage with them when they arrived. She testified that Guadalupe would stay in Carmen's bedroom while the others slept on an air mattress in the living room.

The government provides no concrete evidence that would counter the testimony of Guadalupe and Tabizon. Rather, the government attacks the credibility of each witness. First, the government argues that Guadalupe has a clear interest in helping her father. In addition, the government argues that Guadalupe was sufficiently impeached that her testimony should be disregarded. Guadalupe testified that she did not know where her sister Maribel worked in Wisconsin, but she admitted on cross examination that she in fact went to Maribel's employer's office in February, 2001 to pay for Maribel's insurance premiums. Finally, as discussed above, the government argues that Tabizon's credibility is questionable because of her ability to speak English and the fact that her rental application indicated that she worked with a temporary agency despite testifying that she was unemployed.

There appears to be sufficient evidence to show that Fidel was an overnight guest at the Chicago apartment, even though he had not yet spent the night there. In this case, it seems that defendant Fidel intended to stay at the apartment in question and that he had an invitation to do so from a leaseholder, Tabizon. Although the government has raised some question as to Guadalupe's credibility, her testimony was sufficiently corroborated by Tabizon. Furthermore, Guadalupe's testimony that she intended to buy a dress in Chicago for the February 17 wedding

is credible. If Fidel had intended only to sell narcotics in the Chicago apartment without staying the night, he would not have needed to bring his daughter with him. Without more evidence, the government's attacks on the witnesses' credibility are insufficient to overcome defendants' evidence. Therefore, the court finds that both defendants had a legitimate expectation of privacy in the Chicago apartment and may challenge the DEA's seizure of evidence.

## II. Constitutional Violation

Defendants argue that the government did not have a warrant to search the Chicago apartment or to arrest them and therefore violated their Fourth Amendment rights. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "Unless there is an emergency ('exigent circumstances'), government agents need a warrant to conduct a search of or make an arrest in a person's home without his consent, even if they have probable cause to believe there is contraband or other incriminating evidence there." *United States v. Paul*, 808 F.2d 645, 647 (7th Cir. 1986) (citing *Payton*, 445 U.S. at 587-88). The government argues that although it did not obtain a warrant before entering the Chicago apartment and arresting defendants, the search and arrests were nevertheless legal. First, the government invokes the doctrine of "consent once removed," which provides an exception to the warrant requirement in the Seventh Circuit. *United States v. Akinsanya*, 53 F.3d 852, 856 (7th Cir. 1995). Second, the government argues that it had the right to enter the apartment based on exigent circumstances. Finally, the government claims that, assuming that the agents legally entered the apartment, the seizure of the gym bag at issue was legal based on the plain view doctrine.

A.  Consent Once Removed

The doctrine of consent once removed is applicable where "the undercover agent or government informant: (1) entered at the express invitation of someone with authority to consent; (2) at that point established the existence of probable cause to effectuate an arrest or search; and (3) immediately summoned help from other officers." *Akinsanya*, 53 F.3d at 856. It makes no constitutional difference whether the case involves a CI or an undercover police officer or agent. *See United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994).

The only issue before the court is whether the three requirements of *Akinsanya* have been met. Defendants do not dispute that the CI entered the apartment with consent. However, defendants vehemently dispute that the government has met either of the other two elements of the doctrine. Because the court holds that the government fails to meet the third requirement, that the CI immediately summoned help from other officers, it need not decide whether there was, in fact, probable cause to effectuate the search or arrest.

The doctrine of consent once removed in the context of a CI found its Seventh Circuit origins in *Paul*, 808 F.2d at 648. In that case, a CI arranged to buy a bale of marijuana from the defendant for $44,000. The CI arrived at the defendant's house, was led to the basement, and saw two bales of marijuana. The CI then summoned federal agents waiting outside by engaging a transmitting device. The agents knocked on the door of the house, and when there was no answer, they entered, went to the basement, saw the bales of marijuana, and arrested the defendant. The Seventh Circuit held that the agents' warrantless entry into the defendant's home was legal based on consent. *Id.* at 647-48. In other words, any privacy interest that the defendant homeowner had was "fatally compromised when the owner admit[ted] a confidential informant

11

and proudly display[ed] contraband to him." *Id.* at 648. The court noted that if the CI were a

police officer, he could have arrested the defendant himself and seized the drugs or summoned

help from additional agents. *Id.* The CI also could have testified that he saw the marijuana, or

seized the marijuana himself. *Id.* Therefore, the court held that it would not unduly narrow

Fourth Amendment rights for the CI to "invite agents in to protect him and arrest Paul." *Id.*

However, the Seventh Circuit has placed limits on the scope of the consent once removed

doctrine:

> [It applies] only where the agent (or informant) entered at the express invitation of
> someone with authority to consent, at that point established the existence of
> probable cause to effectuate an arrest or search, and immediately summoned help
> from other officers. We do not intend to suggest by our analysis that one
> consensual entry means that law enforcement agents may thereafter enter and exit
> a home at will.

*United States v. Diaz*, 814 F.2d 454, 459 (7th Cir. 1987), *cert. denied*, 484 U.S. 857 (1987).

Indeed, no Seventh Circuit case has addressed the issues raised by this case, in which the CI left

the premises with no intention to promptly reenter, and agents subsequently–albeit within a few

minutes–reentered the premises without the CI. To apply consent once removed to this case

would be to expand the application of the doctrine beyond any limiting principle suggested by the

Seventh Circuit cases. In this case, the invited person definitively left the premises. The

apartment door was closed. Had the CI attempted to reenter, he would have had to seek

permission to enter all over again.

One court in this district has held that the consent once removed doctrine should apply

under similar circumstances. In *United States v. Santiago*, Nos. 92 CR 881-1, 92 CR 881-2,

1993 WL 75140 (N.D. Ill. March 15, 1993), a CI entered the defendants' apartment with consent

12

and was shown a kilogram of cocaine. The CI told the defendants that he needed to retrieve the money and would return shortly. The CI returned to his car and informed a federal agent of the transaction. The agent told the CI to leave, which he did. Within fifteen minutes of the CI's exit of the apartment, federal agents entered the apartment, without a warrant, using a battering ram, and arrested the defendants. The court held that despite the fact that so much time had elapsed after the CI left the apartment, and despite the fact that the CI was not present when the agents entered the apartment, the government had met the requirement that the CI "immediately summon" help. *Id.* at *4 ("[The agents'] actions after the CI established probable cause essentially constituted an unbroken chain of events, and the arrests were executed without interruption or significant loss of time.").

This court respectfully disagrees with the reasoning in *Santiago* on two general grounds. First, unlike the *Santiago* court, this court concludes that the fact that the CI had definitively left the premises when the agents forcibly reentered the apartment is very important, if not dispositive. Second, the court disagrees with the *Santiago* court's definition of the phrase "immediately." The passage of more than a few moments is significant when Fourth Amendment privacy rights are at stake.

1. *CI's presence*

The court in *Santiago* held that the fact that the CI was not present when the agents entered the defendant's home was not significant. The court relied on language in *United States v. White*, 660 F.2d 1178, 1183 (7th Cir. 1981), to support its conclusion. However, the *Santiago* court failed to discuss certain distinguishing points in *White*'s reasoning. In *White*, undercover agents negotiated a heroin deal with the defendants, entered their apartment with consent, and

viewed the heroin. After one of the defendants left the premises during the deal, federal agents

outside arrested him, then used his keys to reenter the apartment. The Seventh Circuit held that

the second entry was not "a separate intrusion in view of the fact that [the undercover agent]

*remained in the apartment at all times* after his initial consensual entry." *Id.* at 1183 n.3

(emphasis added). An important justification for consent once removed is the aid and protection

of the undercover agent or CI *still at the defendant's home. See Paul*, 808 F.2d at 648 (applying

consent once removed where the CI "invite[d] agents in to protect him and arrest Paul"); *United*

*States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983) (holding that once consent is obtained by an

undercover officer, "any remaining expectation of privacy was outweighed by the legitimate

concern for the safety of [the officer still inside]"). Indeed, other courts have relied on *White* to

hold that consent once removed should apply if the officer or CI is present during the second

entry. *See United States v. Bramble*, 894 F. Supp. 1384, 1393 (D. Haw. 1995), *aff'd* 103 F.3d

1475 (9th Cir. 1997) (holding that consent once removed should apply because "the [undercover]

Agents remained on the premises during the time it took for [another officer] to arrive").

However, the court in *Santiago* did not mention this important consideration.

The *Santiago* court pointed to different language in *White*. In *White*, the Seventh Circuit

held that "it serves no purpose to require an arrest warrant where the same intrusion would occur

whether or not the magistrate issued the warrant." 660 F.2d at 1183. The *Santiago* court relied

on this language to hold that the defendants in that case would have welcomed the CI back into

the apartment even after his departure, making a warrant unnecessary. 1993 WL 75140, at *5.

However, in *White*, when the Seventh Circuit discussed the fact that the undercover agents would

have been admitted by the defendants with or without a warrant, it was justifying the *initial* entry

14

of the undercover agents, for which they had express consent. *White*, 660 F.2d at 1183. The court was explaining why there was legal consent, despite the fact that the agents lied to the defendants in order to gain entry. *Id.* In the present case there is no question that the CI legally entered the Chicago apartment with defendants' consent. The question is whether agents may enter an apartment after the CI has left the scene, an issue not addressed in *White*.

The government points to similar language in another Seventh Circuit case. *See Diaz*, 814 F.2d at 459 ("Diaz would have admitted Agent Mueller back into the hotel room, and . . . the fact that he was assisted by other law enforcement officers in securing his arrest cannot make a constitutional difference."). The government argues that just as in *Diaz*, in the present case it was understood that the CI would quickly return with the money; therefore, there was implied consent for the CI to reenter the apartment. As in *White*, however, the Seventh Circuit's language does not apply in this case. In *Diaz*, an undercover agent had stepped out of the defendant's hotel room, summoned agents, then knocked on the door to gain reentry. When the defendant answered the door, the undercover agent said that he had forgotten his keys and coat; the agents then entered the room by force. Importantly, however, the undercover agent was still present, albeit in the hallway.[2] In permitting the warrantless entry, the Seventh Circuit implicitly expanded, but did not altogether reject, the reasoning in *White* that relied on the fact that the undercover agent "remained in the apartment at all times." 660 F.2d at 1183 n.3. In the present case, however, the CI left the scene and drove away. After the CI had driven away, DEA agents

---

[2]The Seventh Circuit did not discuss the significance of the undercover agent's presence, however.

forcibly entered the apartment without the CI.[3] It is clear that the agents were not assisting or protecting the CI in any way. While it is likely (although hardly certain) that defendants would have allowed the CI to gain reentry eventually, this does not mean that the "agents may . . . enter and exit [defendants'] home at will." *Id.* To permit a warrantless entry any time a CI has been inside a dwelling would be to render warrants unnecessary in a vast number of circumstances where they have traditionally been required. The court is unwilling to interpret the Seventh Circuit case law so broadly.

## 2. *Definition of "immediately"*

In addition, the court disagrees with the *Santiago* court's definition of "immediately." That court held that "realistically something ceases to be immediate after some reasonable period of time lapses." 1993 WL 75140, at *3. This court agrees. However, the *Santiago* court then held that a passage of fifteen minutes is a reasonable period of time where "the CI and federal agents acted diligently in effecting the arrests and seizing the contraband." 1993 WL 75140 at *4. This court disagrees. The issue is not how diligently the CI or the federal agents worked in order to effectuate the entry and arrest; rather, the question is whether the CI, in fact, "immediately summoned" the agents after establishing probable cause by viewing the drugs. Specifically, the issue is whether the doctrine should apply in this case, where the CI viewed the cocaine, then negotiated with defendants over prices, then left the defendant's home for an indefinite and what all participants expected could be an extended period of time before federal

---

[3]Moreover, the CI did *not* tell defendants that he had the money with him and would return shortly, as the CI did in *Santiago*. Rather, the CI told defendants that he would "bring everything together, we count here." (Defs.' Ex. Transcript at 4:29-30.) This shows that defendants expected the CI to be away from the apartment longer than the two minutes it took the agents to enter.

agents entered.

Two Seventh Circuit cases provide additional guidance to *White* and *Paul* as to the scope of the consent once removed doctrine. In *Diaz*, 814 F.2d, the defendant consented to an undercover agent's entry into his hotel room. Once that agent established probable cause, he left the room and signaled for help from other agents. The undercover agent then knocked on the defendant's door; when the defendant opened the door, the agent told him he forgot his keys and coat. The other agents then rushed into the room. The court held that "the fact that [the undercover agent] *momentarily* stepped out to obtain help from other officers in making the arrest did not vitiate [the] consent." *Id.* (emphasis added). In *Akinsanya*, 53 F.3d, which was issued after *Santiago*, a CI entered the defendant's apartment with consent for a drug deal while DEA agents waited in the hallway outside the apartment. The defendant showed heroin to the CI; the CI then called an agent, under the pretext that the agent was his buyer, and told him that he had seen the heroin. The agent instructed the CI to wait briefly, and then leave the apartment. The CI shortly thereafter opened the door and stepped out of the apartment, at which point one of the agents identified himself as a police officer, displayed his badge, and stepped inside the apartment. The court held that "consent was not withdrawn simply because [the CI] stepped out of the apartment *moments before, or at the same time*, the agents entered." *Id.* at 856 (emphasis added).[4]

---

[4] An additional case is *United States v. Janik*, 723 F.2d 537 (7th Cir. 1983), in which the defendant invited his friend into his apartment to show him a submachine gun he had purchased. After seeing the gun, his friend, who had arranged to have agents from the Bureau of Alcohol, Tobacco and Firearms meet him at the apartment, stepped into the lobby to motion for agents to come in. The agents entered the apartment with the friend present. The Seventh Circuit upheld the entry. *Id.* at 548.

In both *Diaz* and *Akinsanya*, the CI or agent exited the premises momentarily, or at the same time that agents entered the apartment.[5] The Seventh Circuit found these facts to be significant in each case. In the present case, however, the CI did not exit momentarily, then reenter. Likewise, the agents did not enter at the same time that the CI exited. The CI left the apartment and drove away. Almost two minutes later, the agents forcibly entered the apartment. Thus, the factors that the Seventh Circuit has relied on to justify the application of consent once removed (i.e., the undercover agent remains in the apartment; the CI momentarily steps outside, then knocks on the door; the agents enter the apartment at the same time that the CI exits) do not exist in this case. In light of the absence of these factors, the court cannot conclude that the CI "immediately summoned" help.[6]

Like the court in *Santiago*, "[t]his Court is wary not to expand unduly the second entry exception to the warrant requirement so that the decision in *Payton* loses all meaning." 1993 WL 75140, at *5; *see also Payton*, 445 U.S. at 587 ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.") (internal quotation omitted). Unlike the *Santiago* court, this court holds that to apply the consent once removed doctrine to the facts of this case would indeed be to separate the Seventh Circuit cases from their analytical moorings. Without more guidance from the Seventh Circuit, this court cannot apply the doctrine here.

---

[5]In *Akinsanya*, the CI had actually immediately summoned help when he called the federal agent from inside the apartment. 53 F.3d at 855.

[6]Moreover, there is a question whether the CI "summoned" help at all. The CI merely left the apartment, told the agent in the car outside that he saw a bag full of cocaine, and then left the scene.

## B. Exigent Circumstances

The government alternatively argues that it rightfully entered the apartment without a search warrant because there were exigent circumstances. The Supreme Court has noted that exigent circumstances are "few in number and carefully delineated." *Welsh v. Wisc.*, 466 U.S. 740, 749 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 318 (1972)). In the Seventh Circuit, the test for exigent circumstances is "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir. 1980), *cert. denied*, 449 U.S. 1021 (1980). "A mere possibility that evidence will be destroyed . . . is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes." *United States v. Salgado*, 807 F.2d 603, 609 (7th Cir. 1986), *cert. denied*, 487 U.S. 1233 (1988).

The government argues that when the CI left the apartment, defendant Fidel was watching from a window in the apartment. He then saw the CI get into the car parked across the street and slowly drive away. The government seems to believe that at that moment, there was a danger that defendants would be suspicious when the CI had not returned.[7] The government contends that there were two dangers that made it necessary for the agents to enter immediately: (1) that defendants might destroy the evidence; and (2) that the people inside the apartment would be in danger. These arguments fail.

---

[7]The government makes factually inconsistent arguments, depending on which case law it argues is applicable. When it invokes consent once removed, the government argues that it was understood that the CI would quickly return with the money. However, when the government invokes exigent circumstances, it argues that the defendants had a basis for suspicion that the CI would not return.

The court is not convinced that defendants in this case had any reason to believe that the CI was working for the DEA. The government points to evidence that as Fidel watched the CI through the window, he shook his head back and forth. This evidence, when considered in light of what Fidel actually saw the CI do, is insufficient to show that Fidel concluded that the CI was an informant. The CI had told Ruben that he needed to get money (the price had been raised during the discussion in the apartment), so he left and drove away with his "nephew" driving the car. The CI did not say that he had the money with him, or that he would be right back. Moreover, there was not enough of a delay to create a reasonable suspicion that the CI would not return. *See Diaz*, 814 F.2d at 458 (no exigency where defendant did not suspect undercover agent and indicated he would wait for agent to return); *Santiago*, 1993 WL 75140, at *2 (no exigency where CI requested to leave the apartment to see his "money man," whom the defendant had already met, and where delay in returning was not unreasonable).

In *Paul*, the Seventh Circuit described a situation similar to the facts of this case:

> [The CI] would have been in danger if, having agreed to bring the $44,000 for the marijuana, and having been shown the marijuana all neatly baled and ready to go, he had told Paul, "Oh, gee, I forgot to bring any money. I'll run home and get some." Without more, such danger would create an emergency justifying the agents in entering Paul's house without a warrant. But if the danger could readily have been averted by the federal agents' either getting a search warrant and executing it in lieu of sending Moore into the house, or giving him $44,000 in marked money (a conventional method of using confidential informants to incriminate drug dealers), then *the danger, having been created by the agents' lack of imagination, would not justify a search without a warrant.*

*Paul*, 808 F.2d at 647 (citations omitted) (emphasis added). The same situation is true in this case. The DEA's plan in this case was for the CI to leave the apartment with the defendants. When the plan failed and defendants remained inside the apartment, any resulting danger was

created by the agents' failure to prepare for this scenario, such as having the CI signal them for help. *Id.* But most significantly, what Fidel could have observed was entirely consistent with the CI's ruse: he was going to get the additional money and would return. The court sees no likelihood that on such facts, the defendants would destroy $154,000 worth of cocaine.

The court is puzzled by the fact that the government never obtained a warrant in this case. The government's argument that the agents were not required to retrieve a warrant until they were reasonably certain that the evidence would support a conviction is unsatisfying here. The agents were more than able to acquire a warrant after hearing the CI's recorded conversations with defendants negotiating the purchase of cocaine, especially after Ruben told the CI that Fidel had delivered cocaine to the Chicago apartment on February 14. *See Paul*, 808 F.2d at 647 (holding that a tape on which a defendant told the CI to bring $44,000 later that morning established probable cause that the defendant had marijuana on his property; agents should have obtained a warrant). Furthermore, the agents also could have obtained a telephonic warrant immediately after the CI reported that he saw the cocaine. *Santiago*, 1993 WL 75140, at *2 (when the CI left the apartment after having seen marijuana, "[t]he agents had a period of time adequate to obtain a telephonic warrant"). Or perhaps they could have obtained an anticipatory warrant. *See United States v. Dennis*, 115 F.3d 524, 528 (7th Cir. 1997) ("[P]robable cause to uphold an anticipatory search warrant exists when a government official presents independent evidence indicating that delivery of contraband will, or is likely to, occur and when the magistrate conditions the warrant on that delivery.") (citation omitted).

The government's reliance on exigent circumstances fails and the court holds that the agents' entry was illegal. Therefore, the doctrine of plain view is unavailable to the government.

*See Diaz*, 814 F.2d at 460 (holding that for the plain view doctrine to apply, "the presence of the police in the area where they observe the item must be lawful") (quotation omitted).

## Conclusion

The court is satisfied, from the evidence presented, that the half open gym bag, apparently containing narcotics, was observed in plain view during the initial protective sweep of the apartment, before Tabizon's consent was obtained. The parties have not adequately addressed what now emerges as an important issue: whether consent obtained following an illegal entry and observation of the disputed evidence can legitimate the admission of the disputed evidence. The parties may file cross briefs on this issue within ten days of the date of this order and cross replies seven days thereafter.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:   January 14, 2002